DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SCOTT SIMEON (NYBN 5012653)
Assistant United States Attorney

>     150 Almaden Boulevard, Suite 900
>     San Jose, California 95113
>     Telephone: (408) 535-5061
>     FAX: (408) 535-5066
>     scott.simeon@usdoj.gov

Attorneys for United States of America

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CLARENCE PETER CHAN,<br><br>　　　　Defendant. | CASE NO. CR 19-00521 BLF<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND QUASH SEARCH WARRANTS<br><br>Date:　February 9, 2021<br>Time:　9:00 A.M. |

1

## TABLE OF CONTENTS

2   I.     Factual Background ................................................................................................1

3   II.    Fourth Amendment ...............................................................................................6

4          a.  Emergency ................................................................................................6

5          b.  Good Faith ..............................................................................................11

6          c.  Independent Source.................................................................................13

7          d.  Inevitable Discovery ...............................................................................14

8          e.  Policy Considerations .............................................................................15

9   III.   Search Warrants ..................................................................................................16

10         a.  Probable Cause.......................................................................................16

11         b.  *Franks* Hearing ....................................................................................18

12  IV.    Conclusion ..........................................................................................................20

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

## Cases

3

*Brigham City, Utah v. Stuart,*
   547 U.S. 398 (2006)......................................................................................................... 6, 9

4

*Davis v. United States,*
   564 U.S. 229 (2011)............................................................................................................ 12

5

*Franks v. Delaware*
   438 U.S. 154 (1978)...................................................................................................... 18, 19

6

*Georgia v. Randolph,*
   547 U.S. 103 (2006).............................................................................................................. 6

7

*Graham v. Connor,*
   490 U.S. 386 (1989)........................................................................................................ 7, 10

8

*Herring v. United States,*
   555 U.S. 135 (2009)........................................................................................ 12, 13, 15, 16

9

10

*Illinois v. Gates,*
   462 U.S. 213 (1983)............................................................................................................ 16

11

*Mincey v. Arizona,*
   437 U.S. 385 (1978)........................................................................................................ 6, 11

12

*Minnesota v. Dickerson,*
   508 U.S. 366 (1993)............................................................................................................ 11

13

*Murray v. United States,*
   487 U.S. 533 (1988)................................................................................................ 13, 14, 15

14

*Nix v. Williams,*
   467 U.S. 431 (1984)............................................................................................................ 14

15

*Pennsylvania Bd. of Prob. & Parole v. Scott,*
   524 U.S. 357 (1998)............................................................................................................ 12

16

17

*People v. Blakely,*
   225 Cal. App. 4th 1042 (2014) ......................................................................................... 16

18

*People v. Cain,*
   216 Cal. App. 3d 366 (Ct. App. 1989)................................................................................ 7

19

*Ryburn v. Huff,*
   575 U.S. 469 (2012).............................................................................................................. 7

20

*Sandoval v. Las Vegas Metro. Police Dep't,*
   756 F.3d 1154 (9th Cir. 2014) ............................................................................................ 7

21

*United States v. Black,*
   482 F.3d 1035 (9th Cir. 2007) ........................................................................................ 7, 8

22

23

*United States v. Brown,*
   64 F.3d 1083 (7th Cir. 1995) .............................................................................................. 9

24

*United States v. Calandra,*
   414 U.S. 338 (1974)............................................................................................................ 12

25

*United States v. Grubbs,*
   547 U.S. 90 (2006).............................................................................................................. 16

26

*United States v. Leon,*
   468 U.S. 897 (1984)............................................................................................................ 17

27

*United States v. Martinez,*
   406 F.3d 1160 (9th Cir. 2005) ............................................................................................ 7

28

*United States v. Ramirez-Sandoval,*
    872 F.2d 1392 (9th Cir. 1989) ............................................................................. 14
*United States v. Russell*
    436 F.3d 1086 (9th Cir. 2006) ......................................................................... 9, 10
*United States v. Snipe,*
    515 F.3d 947 (9th Cir. 2008) .................................................................. 7, 8, 9, 10
*Utah v. Strieff,*
    136 S. Ct. 2056 (2016) .................................................................................. 13, 15

Statutes

18 U.S.C. § 922(g)(1) ............................................................................................. 1
18 U.S.C. § 922(k) .................................................................................................. 1
18 U.S.C. § 931(a) .................................................................................................. 1
26 U.S.C. § 5861(d) ............................................................................................... 1
Cal. Penal Code § 29800 ...................................................................................... 16

On October 10, 2019, a federal grand jury returned a four-count indictment charging defendant Clarence Chan with felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d); possession of a firearm with obliterated serial number, in violation of 18 U.S.C. § 922(k); and possession of body armor by a violent felon, in violation of 18 U.S.C. § 931(a).  Indictment, ECF No. 17.  On November 9, 2020, the defendant filed a motion to suppress evidence and quash search warrants.  Def.'s Mot., ECF No. 51.  The defendant argues that police officers' warrantless entry into his home violated the Fourth Amendment, Def.'s Mot. 13–22, and that the subsequent search warrant affidavits were facially insufficient to establish probable cause, Def.'s Mot. 22–26.  The defendant's motion should be denied for various independent reasons: (1) the police conducted a lawful welfare search of the defendant's home based on information that another victim was inside; (2) even if the search was not lawful, the police had a good-faith basis to believe that it was lawful; (3) even if information from the welfare search were suppressed, the police had an independent source of that information; (4) even if evidence derived in part from the welfare search were suppressed, the evidence would have been inevitably discovered; (5) with or without information from the welfare search, the affidavits established probable cause that evidence of illegal firearms possession would be found in the defendant's home; and (6) even if there were some deterrent benefit from suppressing evidence in this case, that minimal benefit would be outweighed by the substantial social costs of letting a violent felon escape culpability for illegally possessing multiple firearms (including a stolen firearm), firearms parts, ammunition, and body armor.

## I.    Factual Background

On May 28, 2018, at approximately 8:50 a.m., the Palo Alto Police Department received a 911 call from a hysterical female.  Def.'s Ex. D 1:9; Def.'s Ex. E 1:26, 2:16–18.  The caller stated that a man—"the guy [she] was seeing"—had "tackled her down," taken her phone, and threatened her, and that she had fled to the neighbor's house.  Def.'s Ex. D 1:9–28.

At approximately 8:52 a.m., officers were dispatched to respond to this assault and battery, and were told that the neighbor's address, where the victim had fled, was 3195 Alexis Drive.  Def.'s Ex. E 1:8–12.  The dispatcher added that it was unknown whether the male battery suspect was also at 3195 Alexis Drive or at the location of the battery.  Def.'s Ex. E 1:20–21.  This location information later

1   turned out to be wrong; in fact, that was the defendant's address and the location *from* which the victim

2   had just fled.  Def.'s Ex. E 5:12–20.  The dispatcher explained to responding police officers that the

3   situation was "extremely convoluted" and that the battery victim was "extremely hysterical."  Def.'s Ex.

4   E 1:16–26.  Because the victim was having such a difficult time communicating, the dispatcher began

5   speaking with the neighbor instead.  Def.'s Ex. D 3:5–6.  As the neighbor said later through a translator,

6   "[Y]ou have to hurry.  Right now, all my family member in . . . be with this person.  She's very

7   scared. . . . No, she's not stable right now, so I have to answer for her."  Def.'s Ex. D 6:6–12.  The

8   neighbor needed the assistance of a translator because she did not speak English well.  Def.'s Ex. D

9   3:15–4:26; Def.'s Ex. E 1:26–27.  This resulted in the insertion of two individuals on the 911 call

10  between the victim and the dispatcher, and this situation made it challenging to obtain precise

11  information from the victim throughout the call.  At one point, when asked for additional information by

12  responding officers, the dispatcher explained the difficulty of getting information:  "We're still going

13  through a translator, and then that person that's going through a translator is talking to the hysterical

14  [victim]."  Def.'s Ex. E 2:14–16.

15      The dispatcher was subsequently able to identify the suspect—the victim's "boyfriend"—as

16  Clarence Chan.  Def.'s Ex. E 2:19.  Adding to the confusion, however, the dispatcher identified

17  (correctly) Chan's address as the address to which it was believed (incorrectly) the victim had fled, 3195

18  Alexis Drive.  Def.'s Ex. E 2:21–22.  Right after Chan was identified as the suspect, Palo Alto Police

19  Agent Chris Correia announced over the police radio that he knew Chan and that Chan had "numerous

20  weapons" and was "big into . . . swords and guns."  Philip Decl. ¶ 6 (Ex. 1); Def.'s Ex. E 2:23–3:1.

21  Upon hearing this, Palo Alto Police Sergeant Brian Philip had a phone conversation with Agent Correia

22  to gather additional information.  Philip Decl. ¶ 6; Def.'s Ex. E 3:5–7.  Sergeant Philip was the on-duty

23  patrol supervisor and was at the police station at the time of the incident.  Philip Decl. ¶¶ 3–4.  Agent

24  Correia told Sgt. Philip he was familiar with Chan from prior dealings and knew Chan was a weapons

25  enthusiast who owned weapons, swords, and guns.  Philip Decl. ¶ 6.  Sergeant Philip immediately left

26  the station to drive to the incident.  Philip Decl. ¶ 7.  Because of the serious nature of the incident, all

27  available Palo Alto police units also responded to the scene.  Philip Decl. ¶¶ 4, 7; *see also* Def.'s Ex. E

28  11:16 (stating that "when [a later] call [for service] came out, everyone was on Alexis.")

While officers were driving to the scene, police dispatch provided additional information, including Chan's criminal history and firearms history.  Philip Decl. ¶¶ 8–10; Def. Ex. E 4:14–16.  The victim also provided additional information to dispatch, including:

> So what he did, he keep threatening me.  He came up to me and then he tried to reach to my back pocket, and I prevented him from doing that.  So, what he did, he tackled me down to the ground and took my phone.
>
> And then he . . . and then he tried to . . . he . . . he . . . he tackled me down, and then I tried to get my phone back.
>
> So, what he did, he threw it over . . . over the . . . gate.  He threw it across the street and I was able to run out and grab it, but he came with me and then he started . . . he started choking me.
>
> And . . . and . . . and then take my phone and . . . and he went back inside the house.  He tried to kick me out of the house and then . . . and then uh . . . and then he was . . . he . . . he tried to take it to the pool.  And he said like, "You fucking go near me, I'm going to throw this damn phone in the pool."  And then I begged him.  I begged him.  I've just never been in this situation, ever.

Def.'s Ex. D 13:12–14.  Shortly after that, the neighbor returned to the call and said through the translator, "She is really unstable now."  Def.'s Ex. D 14:21.  The dispatcher answered, "I understand.  Uh, we're sending paramedics too, just in case.  And she's crying like that and I know that she said she was choked.  We're sending paramedics, and we're sending police.  Uh, did you guys uh, make sure your door was locked so that the ex-boyfriend doesn't come over to your guys' house?"  Def.'s Ex. D 14:22–24.  Later, when the neighbor asked the victim during the recorded 911 call, "He has . . . like so he has been abusive to you over many times?", the victim says:

> He has pushed me.  He has like literally laid his hand on me and pushed me like that, over and over.  And then . . . and then I told him, I said, "You know don't . . . don't you . . . don't push me."  I said, "Don't you ever lay your hands on me."  And there was like a gardener there.
>
> Because—you know—there's a gardener, that cleans his house like . . . I don't know how . . . how often.  He was there.  And I told him, I said, "If this man ever touches me again right in front of you, you better call the cops."  You know?  I told the . . . I told them.  And then . . . and . . . and then he got . . .  like he . . . I don't know if he was joking or what, but he said to me that, "You know all it takes for me is to just snap your neck, all . . . and—you know—you'll be dead.  And I bet you anything that gardener would even help me throw you.  Throw your body in the . . . ."  In like down there in the . . . in his backyard.  He has said that.  But like—you know—like . . . would you take that seriously or would you not?  You know?

> I didn't.  And then today . . . today . . . today was like the day that I was
> fucking scared as hell.  I was . . . didn't know if it . . . because I know
> everybody here has like gated . . . gated houses.  And, you know.  It's like
> I didn't know who to run for help.  I've been screaming and screaming,
> and nobody was coming.

Def.'s Ex. D 23:14–24:1.

In addition to providing information via radio, police dispatch also provided information through written messages on the computer-aided dispatch (CAD) system.  Philip Decl. ¶ 9; Def.'s Ex. F.  At approximately 9:01 a.m., dispatch wrote on CAD that "he also has her friend."  Def.'s Ex. F 2.  Approximately 13 minutes later, at 9:14 a.m., the CAD entry was corrected to, "He has her phone not 'friend.'"  Def.'s Ex. F 3.  However, by that point, officers were already at the staging area making final preparations to move to the defendant's residence, and they did so under the belief that the defendant also had the victim's friend.  Philip Decl. ¶¶ 7, 9, 12.

When police arrived at the defendant's residence, they arrested him outside, then conducted a welfare search of the residence to see if there were any other victims in need of help.  Philip Decl. ¶¶ 13–14; Def.'s Ex. E 7:16 ("Myself, 5, 44, and 45 are going to clear his house to make sure [there are no other people in need of help] inside.").  Officers searched as quickly as possible, covering the 4,000 sq. ft. house with outbuildings and other searchable outdoor areas in about ten minutes.  Philip Decl. ¶ 15; Def.'s Ex. E 7:16–8: 13.  They also moved tactically for their own safety.  Philip Decl. ¶¶ 13–15.  They looked only in areas that were large enough to conceal a person.  Philip Decl. ¶ 16.  During the search, officers did not find any other victims, but they did see in plain view firearms and related contraband.  Philip Decl. ¶ 16.

Separately, other officers, including Officer Yolanda Franco-Clausen, went to the neighbor's house and interviewed the victim.  Def.'s Ex. G.  Officer Clausen's interview with the victim included the following exchange:

> Victim:   [H]e just told me he builds guns for a living.  Like he . . . he builds them, and then he . . . he does have like bulletproof vests.  He has like I don't know.  Uh . . .
>
> Clausen:  Do you know why he has all that?
>
> Victim:   He told me he builds them.  Those guns . . .
>
> Clausen:  Builds them?  But why the vests?  Tactical vests and stuff?

| | | |
|---|---|---|
| Victim: | Uh . . . uh, well he said he was in the military. |
| Clausen: | OK.  Does he have a lot of them? |
| Victim: | I don't know, because sometimes he would have like . . . like a plate [?] come in.  Shipping. |
| Clausen: | OK. |
| Victim: | He'll have like a place for . . . |
| Clausen: | That's . . . OK. |
| Victim: | For that. |
| Clausen: | [unintell] Uhuh. |
| Victim: | Yeah.  Come in and . . . yeah.  Because he says like he . . . he builds . . . he builds them for cops.  Cops would buy from him. |

Def.'s Ex. G 69:5–21.

Later that day, Sgt. Adrienne Moore applied for and obtained a firearms emergency protective order against the defendant and, after that, applied for and obtained a warrant to search the defendant's residence for firearms and ammunition.  Ex. A.  In her search warrant affidavit, Sgt. Moore included information from the welfare search and, separately, from the victim's statements.  Def.'s Ex. A.  The search warrant application was granted, and police searched Chan's home the following morning. Def.'s Exs. A, B.

Later on May 29, 2018, Sgt. Moore authored a second, expanded search warrant affidavit based on additional information she received from two independent sources.  Def.'s Ex. B.  First, during the execution of the search warrant, officers found a variety of additional firearms-related contraband. Def.'s Ex. B.  Second, the victim gave a second, lengthier interview, adding significantly more details about her knowledge of the defendant's involvement in illegal firearms during the course of their ten-month relationship.  Def.'s Ex. B.; Def's Ex. H 18:6–7 ("[H]e would show me the things he makes for people or whoever like parts of the guns."), 19:5–10 ("He says he makes [guns].  Like makes them and sells them and he tells me that like he was making bulletproof vests for cops.  They would buy from him.  That's what he told me. . . .  I never seen.  But I've seen like parts of a gun being shipped to his house like that he makes for someone."), 22:1–6 ("[H]e says you better be careful because I have booby traps.  I was like okay whatever; like I never took it seriously and then he kept asking me before, this

kind of rings through now like he kept asking me are you scared.  I was like scared of what?  He was

like because I have all these weapons.  I was like I dated a sheriff before and he's obviously interested in

guns; I've seen how he secures it.  But I said yeah this is new to me like exposed."); 25:6–10 ("And he

asked me he's like hey do you think your cousin can ship magazines—gun magazines to here. . . .  He

just says it's too much magazines and those magazines are like illegal here.  Those type of gun

magazines."); 37:5–6 ("[H]e would just have—it's like a long gun with a stand; he would just have it on

the counter."); 38:14–17 ("He told me there's guns in his room but I—he never told me exactly where.

He told me there's guns all over the house.  And I asked him, why do you need that.  Who is going to

come after you?  He's like no, you got to be prepared because if you go to war or whatever.").  In

addition to these statements, the victim also showed photos of the defendant's firearms that she received

from the defendant on her phone.  Defendant's Photos (Ex. 3); Def.'s Ex. H 20:5–21:22 (discussing

firearms and photos of firearms).  One of these photos was accompanied by text messages from the

defendant asking, "Which do you think is more me?  This one or the other."  Defendant's Photos at 3.

The second search warrant application was granted.  Def.'s Ex. B.  In executing the first and

second search warrants, the police found what can only be described as an arsenal of firearms,

ammunition, and related contraband.  *See* Search Warrant Photos (Ex. 4).

## II.   Fourth Amendment

### a.   Emergency

The general rule is that warrantless searches inside a home are presumptively unreasonable.

*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  "Nevertheless, because the ultimate touchstone

of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions."

*Id.* at 403.  One exception is that "law enforcement officers may enter a home without a warrant to

render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  *Id.*

at 403–04 (2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *Georgia v. Randolph*, 547 U.S.

103, 118 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering . . . to

determine whether violence (or threat of violence) has just occurred or is about to (or soon will)

occur")).  The police have an "undoubted right . . . to enter [a dwelling] in order to protect a victim."

*Randolph*, 547 U.S. at 118–19.

To determine if this emergency exception applies, the Ninth Circuit applies a two-pronged test: whether "(1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). Officers' actions are assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1163 (9th Cir. 2014) (quoting *Ryburn v. Huff*, 575 U.S. 469, 477 (2012)). In a welfare search, "[e]rring on the side of caution is exactly what we expect of conscientious police officers." *United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007). In such cases, "where rescue is the objective," "[w]e should not second-guess the officers' objectively reasonable decision." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Ryburn*, 565 U.S. at 477 (quoting *Graham v. Connor,* 490 U.S. 386, 396–397 (1989)) (alteration omitted); *see also People v. Cain*, 216 Cal. App. 3d 366, 377 (Ct. App. 1989) (discussing various California state cases in which warrantless entry was justified by a desire to save lives or property and concluding that "one must wonder how it would have appeared if someone in apartment D had been attacked and injured and was left in that apartment while the officers were explaining the matters to a magistrate.").

"The volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). "When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Id.* (internal quotation marks and citations omitted).

Three Ninth Circuit cases illustrate the emergency doctrine particularly well. First, in *United States v. Black*, police were dispatched to the defendant's apartment after his ex-girlfriend called 911 from a local grocery store and reported that he had beaten her up that morning in the apartment and had a gun. 482 F.3d 1035, 1039 (9th Cir. 2007). She said she and her mother planned to return to the apartment to pick up her clothing, and they would wait outside the apartment in a white Ford pickup

1   truck until police arrived.  *Id.*  The police arrived a few minutes later, but saw no signs of the ex-

2   girlfriend, her mother, or their truck outside the apartment or at the nearby grocery store.  *Id.*  Officers

3   knocked on the apartment door, but no one answered.  *Id.*  Officers then found the defendant in the

4   backyard area.  *Id.*  He identified himself and admitted knowing the police were investigating a domestic

5   violence call, but denied knowing his ex-girlfriend's whereabouts and denied living in the apartment.

6   *Id.*  With the defendant's consent, police searched his pockets and found an apartment key; using the

7   key, they entered the apartment and conducted a quick sweep to see if anyone was inside.  *Id.*

8       The Ninth Circuit held that the officers' warrantless search of the apartment was justified by

9   exigent circumstances "because they feared that [the ex-girlfriend] could have been inside the apartment,

10  badly injured and in need of medical attention."  *Id.*  Judging the objective reasonableness of the

11  officers' actions "by the circumstances known to them" at the time of those actions, the *Black* court

12  reasoned that "[t]he officers did not have the time to conduct a thorough examination of all the

13  information that was available to them and to conclude, as we might after the fact, that [it] was an

14  unlikely possibility" the ex-girlfriend was "in the apartment injured."  *Id.* at 1040.  "This is a case where

15  the police would be harshly criticized had they not investigated and [she] was in fact in the apartment."

16  *Id.*

17      Second, in *Snipe*, police were dispatched to the defendant's house after an unidentified "very

18  hysterical sounding" male called the regular, non-emergency police line at approximately 5:00 a.m. and

19  screamed "get the cops here now," or words to that effect, before the call was disconnected.  515 F.3d

20  947, 949 (9th Cir. 2008).  Two officers responded to the call.  *Id.*  One of the two officers, who lived

21  down the street, saw a vehicle he did not recognize parked in front of the house and saw a person he did

22  not recognize walk into the house.  *Id.*  Unlike the other houses in the area, the lights were on inside.  *Id.*

23  When one of the officers knocked on the door, which was partially ajar, the door swung open from the

24  force of the knocking and the officers entered the residence.  *Id.*

25      Based on the totality of these circumstances, the Ninth Circuit held that "the officers had an

26  objectively reasonable basis for believing there was an immediate need to protect individuals at the

27  Snipe residence from serious harm."  *Id.* at 953.  Indeed, the mere fact that "officers knew that they were

28  responding to an emergency call by 'a hysterical male' who instructed the dispatcher to '[g]et the police

UNITED STATES' OPP'N TO DEF.'S MOT. TO SUPPRESS
CR 19-00521 BLF                                                        8

1   over here now' . . . alone largely justified their response." *Id.*  The *Snipe* court reasoned that "requiring

2   officers to weigh the severity of the ongoing emergency before responding would dramatically slow

3   emergency response time, and would therefore be at odds with the purpose of the emergency doctrine—

4   allowing police to respond to emergency situations." *Id.* at 952 n.6 (internal quotation marks and

5   alteration omitted).  "[P]olice officers do *not* have to wait for violence before acting." *Id.*  (citing

6   *Brigham City*, 547 U.S. at 406 ("The role of a peace officer includes preventing violence and restoring

7   order, not simply rendering first aid to casualties."); *United States v. Brown*, 64 F.3d 1083, 1086 (7th

8   Cir. 1995) ("We do not think that the police must stand outside an apartment, despite legitimate

9   concerns about the welfare of the occupant, unless they can hear screams.  Doubtless outcries would

10  justify entry, but they are not essential.")).

11      Third, in *United States v. Russell*, the defendant placed two 911 calls for help, both describing

12  being shot in the foot but varying in other details.  436 F.3d 1086 (9th Cir. 2006).  In the first call, he

13  said his name was "Gregory Hines," that he had been shot in the foot, and that he needed an ambulance.

14  *Id.* at 1087.  In the second call, he gave his real name, "Willie Russell," clarified that he had shot himself

15  in the foot, and said that he was home alone, although the dispatcher heard other voices in the

16  background.  *Id.* at 1088.  Responding deputies received information through radio calls and through

17  text updates in the CAD Event Report.  *Id.* at 1087–88.  When deputies arrived, one of them saw an

18  injured man (later identified as the defendant) hopping out of the garage to his car with the assistance of

19  two females.  *Id.* at 1089.  While that deputy approached and questioned the defendant, two other

20  deputies "immediately entered the house with their guns drawn" to see if there were any other victims in

21  the house.  *Id.*

22      In holding that the warrantless entry and search were justified under the emergency doctrine, the

23  Ninth Circuit explained that because "the police received a variety of conflicting data," they "had reason

24  to believe that there were two injured" people at the residence.  *Id.* at 1090.  "Given the substantial

25  confusion and conflicting information, the police were justified in searching the house in order to

26  determine whether there were other injured persons, as their information indicated was the case." *Id.*

27  Moreover, the emergency doctrine does not require "that the police obtain independent verification or

28  other information relating to the emergency before entering [a] house." *Id.* at 1091.  "[T]he police only

1   must take additional steps if they otherwise lack reasonable grounds to believe there is an emergency."

2   *Id.* at 1092.

3       In this case, the responding officers properly conducted a welfare search based on the specific

4   and articulable facts known to them at the time of the search.  Those facts included that an "extremely

5   hysterical" female victim called 911 to report an incident of domestic violence, and said that she had just

6   run to escape from the suspect after he tackled her down, took her phone, and choked her.  The dispatch

7   report included information that the location of the suspect was unknown, the suspect's criminal history

8   included assault with a deadly weapon (a firearm) and other firearm charges, and the suspect's premise

9   history included a firearms report.  Dispatch added that the victim had fled to the neighbor's house and

10  was so hysterical that the neighbor had to assist her with the 911 call, but that the neighbor did not speak

11  English well and required the assistance of a translator—the third person on the call with dispatch.

12  Because of the generally volatile nature of domestic violence incidents, the emotional state of the victim,

13  the relaying of information through the neighbor, and the translation of this information through an

14  interpreter, dispatch repeatedly described the situation as "convoluted."  Adding to the confusion was

15  that the victim was first reported to have fled to 3195 Alexis Drive (the defendant's address), and it took

16  several attempts to clarify and correct that information.  On top of all this, the responding officers

17  received a report that the suspect also had the victim's friend.  That this turned out not to be true is of no

18  moment.  What matters is whether the officers on the scene had an objectively reasonable basis to

19  believe there was an immediate need to protect others.  "Even if the situation were clear in hindsight, . . .

20  the police had only a few minutes in which to determine whether a lurking predator or injured person in

21  need of assistance might be inside the house.  It is unreasonable to expect the police to piece together a

22  perfectly coherent picture in the scant minutes they had to digest the constantly-updated and conflicting

23  information." *Russell*, 436 F.3d at 1091 (citing *Graham*, 490 U.S. at 397).  And even if each event did

24  not individually give cause for concern, "it is a matter of common sense that a combination of events

25  each of which is mundane when viewed in isolation may paint an alarming picture." *Ryburn*, 565 U.S.

26  at 476–77.

27       The second prong of the emergency exception test is whether the search's scope and manner

28  were reasonable to meet the need.  *Snipe*, 515 F.3d at 952.  Here, the need was to search for additional

1    victims in a large, split-level residence with outbuildings.  The officers met that need by conducting a

2    quick sweep of the property and looking only in places where a person could reasonably have been

3    found, and by not opening any other containers inside the premises.  In short, the search was

4    proportionate to the exigency.

5            Finally, because the officers were justified in entering and conducting a welfare search of the

6    defendant's home, they could "seize any evidence that [was] in plain view during the course of their

7    legitimate emergency activities."  *Mincey*, 437 U.S. at 393.  While the officers were scanning the

8    premises for persons, they saw firearms and related items out in the open and immediately recognized

9    them as firearms.  Because they were conducting a welfare search, they did not stop to physically

10   inspect the firearms.  Nor did they seize the firearms, even though they were well aware of the

11   defendant's prior felony convictions, which prohibited him from possessing firearms, ammunition, or

12   body armor, and were therefore authorized to seize such evidence under the plain-view doctrine.  *See*

13   *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (stating that the incriminating nature of an object in

14   plain view is "immediately apparent" where police have "probable cause to believe that [it] is

15   contraband without conducting some further search of the object").  Instead, the officers completed their

16   welfare search as planned and reported what they saw afterward.

17           In sum, the responding officers had an objectively reasonable basis for believing there was an

18   immediate need to conduct a search for victims in the defendant's home, they conducted a limited search

19   of the defendant's home that was tailored to the fit the purpose of finding victims, and, in the course of

20   conducting that search, they saw (but did not seize) firearms and related contraband that was in plain

21   view.  Their actions were lawful and, therefore, there is nothing to suppress.

22           **b.    Good Faith**

23           Even if the welfare search was not lawful, the police had a good-faith basis to believe that it was;

24   therefore, the information obtained from that search is properly admissible.  The defendant's argument

25   that the good-faith exception would not apply in this case is misguided.  The defendant erroneously

26   argues that the good-faith exception does not apply to the police officers' reliance on the search warrants

27   because "the search warrants are based on an earlier illegal search."  Def.'s Mot. 29.  But that argument

28   assumes too much, and it skips ahead to the later firearms search warrant when it should have made a

1  stop at the earlier welfare search:  assuming, *arguendo*, that there was an illegal search, the question is

2  whether the officers had a good-faith belief that their welfare search was legal.  If they did, then the

3  good-faith exception does apply, and information from the welfare search was properly included in the

4  search warrant affidavits.

5       The exclusionary rule is not "a personal constitutional right of the party aggrieved," but rather a

6  judicially created remedy whose "prime purpose is to deter future unlawful police conduct."  *United*

7  *States v. Calandra*, 414 U.S. 338, 347–48 (1974).  "As such, the rule does not proscribe the introduction

8  of illegally seized evidence in all proceedings or against all persons, but applies only in contexts where

9  its remedial objectives are thought most efficaciously served."  *Pennsylvania Bd. of Prob. & Parole v.*

10  *Scott*, 524 U.S. 357, 363 (1998) (internal quotation marks and citations omitted).  "To trigger the

11  exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter

12  it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Herring*

13  *v. United States*, 555 U.S. 135, 144 (2009).  Otherwise, the good-faith exception to the exclusionary rule

14  applies:  "when the police act with an objectively reasonable good-faith belief that their conduct is

15  lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses

16  much of its force and exclusion cannot pay its way."  *Davis v. United States*, 564 U.S. 229, 238 (2011)

17  (internal quotation marks and citations omitted).

18       In *Herring*, the Supreme Court extended the good-faith doctrine to apply not just when police act

19  in objectively reasonable reliance on court errors, but also when they rely on police errors that are the

20  product of mere negligence, rather than systemic error or a reckless disregard for constitutional

21  requirements.  555 U.S. 135 (2009).  In that case, the Court decided that the exclusionary rule did not

22  require suppression of drugs and a gun found by officers in a search incident to arrest, even though

23  officers had unlawfully arrested the defendant after receiving incorrect information from a sheriff's

24  department warrant clerk that an arrest warrant was outstanding.  *Id.* at 137–39.  The Court assumed that

25  the defendant was unlawfully arrested, but still decided not to apply the exclusionary rule, noting "[t]he

26  fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does

27  not necessarily mean that the exclusionary rule applies," and exclusion "has always been our last resort,

28  not our first impulse."  *Id.* at 140.  In declining to apply the exclusionary rule on these facts, the Court

1   explained that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or

2   in some circumstances recurring or systemic negligence.  The [police] error in this case does not rise to

3   that level."  *Id.* at 144.

4     In this case, if any error occurred, it was that police dispatch misunderstood what the domestic

5   violence victim said during her frantic 911 call.  The circumstances of that conversation were difficult.

6   The call began with the victim pleading, "Please help me," Def.'s Ex. D 1:17, and continued with a high

7   level of confusion because of the victim's physical, mental, and emotional state, the neighbor relaying

8   information to the police, and an interpreter translating that information for the police because the

9   neighbor did not speak English well.  Any errors in information reaching the officers responding to the

10  domestic violence scene were understandable—they certainly were not deliberate, reckless, or grossly

11  negligent.  The officers reasonably believed that their welfare search was justified; therefore, by

12  definition they did not mislead the magistrate judge, and the information they provided from the welfare

13  search was not tainted.

14    **c.**  **Independent Source**

15    Even if information from the welfare search were suppressed from the first search warrant, the

16  police had an independent source of that information.  "[T]he independent source doctrine allows trial

17  courts to admit evidence obtained in an unlawful search if officers independently acquired it from a

18  separate, independent source."  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (citing *Murray v. United*

19  *States*, 487 U.S. 533, 537 (1988)).  Under this doctrine, "evidence initially discovered during, or as a

20  consequence of, an unlawful search, but later obtained independently from activities untainted by the

21  initial illegality" is admissible.  *Murray*, 487 U.S. at 537.

22    In this case, the first search warrant affidavit, which sought permission to search for firearms

23  possessed by a convicted felon, was based on two sources of information that the defendant possessed

24  illegal weapons.  One source was the "protective search" of the home led by Sgt. Philip.  Def.'s Ex. A.

25  Sergeant Philip reported seeing "rifles, body armor and Pelican cases in the home."  Def.'s Ex. A.  The

26  other source—separate from and independent of the first—was the domestic violence victim.  Def.'s Ex.

27  A ("The victim reported that the suspect has weapons, and that she has seen the weapons.").  The victim

28  stated in her initial interview with police officers that Chan "builds guns for a living" and has

"bulletproof vests," and that he claims to build them for and sell them to law enforcement.  Def.'s Ex. G 69:5–21.  In fact, the police even had a third independent source of this information.  As reported over the police radio, Agent Correia had personal knowledge that Chan owned numerous weapons, swords, and guns.  Philip Decl. ¶ 6; Def.'s Ex. E 2:23–3:1.  These latter two sources were truly independent of the first.  Agent Correia's report over the radio and subsequent phone call with Sgt. Philip were triggered by the 911 call and ensuing dispatch of officers.  The basis of his knowledge was prior contact with the defendant.  The victim interview was conducted by the police investigation team.  That activity was physically separate from the welfare search, and its discoveries were logically separate from the discoveries of Sgt. Philip's search team.

Moreover, the police knew many more facts that they did not include in the affidavits, but easily could have included if they were relying on only one source of information for the search warrant applications.  For example, the basis of the victim's knowledge was that she had been dating Chan for ten months, and during that time that she would "visit here quite often to see him."  Def.'s Ex. G 23:4, 21:27.  She provided many additional details about her knowledge of Chan's involvement with firearms, Def.'s Ex. H, and provided photos of firearms that he had sent her, Ex. 3.

Given these multiple, independent sources of the same basic information, suppressing that information because one of those sources was allegedly tainted serves no good purpose; even worse, it would be harmful to the justice system and to society and run counter to the very purpose of the exclusionary rule.  In such circumstances, "[i]nvoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one." *Murray*, 487 U.S. at 541.  Avoiding this result is precisely the point of the independent source doctrine.

### d.    Inevitable Discovery

Even if evidence derived in part from the welfare search were suppressed, that evidence would have been inevitably discovered.  The inevitable discovery doctrine allows the admission of evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984).  This doctrine "requires that the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself." *United States v. Ramirez-*

1   *Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989).

2        The application of the inevitable discovery doctrine to these facts is similar to that of the

3   independent source doctrine above.  *See Murray*, 487 U.S. at 539 ("The inevitable discovery doctrine,

4   with its distinct requirements, is in reality an extrapolation from the independent source

5   doctrine:  *Since* the tainted evidence would be admissible if in fact discovered through an independent

6   source, it should be admissible if it inevitably would have been discovered.").  Even if the information

7   from the welfare search were suppressed, and even if the evidence from the execution of the first search

8   warrant were suppressed, the police received additional information from the domestic violence victim

9   during her second interview on May 29, 2018.  Def.'s Ex. B ("A follow up interview with the victim . . .

10  revealed that the suspect buys firearms parts, assembles firearms and sells them to 'government

11  agencies.'"); Def.'s Ex. H *passim*.  In support of those further details about Chan's firearms activities,

12  the victim provided photos of firearms that Chan had texted to her.  Ex. 3.

13       The Palo Alto Police Department's interest in public safety and keeping illegal firearms out of

14  the hands of violent felons was not tethered to their conducting a welfare search.  In other words, even

15  without the information from the welfare search, they had knowledge of the defendant's criminal

16  activities and motivation to investigate and stop those activities.  The same search warrant applications

17  and affidavits would have been submitted, albeit without the welfare search information and its

18  derivative evidence, but with additional information and evidence from other sources.  The bottom line

19  is that, with or without the welfare search, the police still would have obtained a search warrant and still

20  would have found Chan's firearms, ammunition, and body armor.

21       **e.    Policy Considerations**

22       Finally, even if this were a close call (it is not), the "significant costs" of the exclusionary rule

23  have led the Supreme Court "to deem it applicable only where its deterrence benefits outweigh its

24  substantial social costs.  Suppression of evidence has always been our last resort, not our first impulse."

25  *Strieff*, 136 S. Ct. at 2061 (internal quotation marks, citations, and alterations omitted).  "The extent to

26  which the exclusionary rule is justified by . . . deterrence principles varies with the culpability of the law

27  enforcement conduct."  *Herring*, 555 U.S. at 143.

28       It is doubtful any deterrent benefit would come from suppressing evidence in this case.  The

1  police were responding to a frantic 911 call of domestic violence, and, in this dangerous and chaotic

2  environment, their actions evidenced a desire to find and protect potential victims.  In fact, suppressing

3  evidence could have a negative social effect:  by causing law enforcement officers to second-guess

4  themselves in a potential emergency, and delaying aid when immediate aid is needed.  Furthermore,

5  even if there were some deterrent benefit from suppressing evidence here, that minimal benefit would be

6  outweighed by the substantial social costs of letting a violent felon escape culpability for illegally

7  possessing an arsenal of firearms, ammunition, and body armor.

8    As of May 28, 2018, the defendant had prior felony convictions for perjury, in violation of

9  California Penal Code Section 118 (1989); assault with a firearm on a person, in violation of § 245(a)(2)

10  (1991); receiving known stolen property, in violation of § 496 (1992); and felon in possession of

11  ammunition, in violation of Title 18, United States Code, Section 922(g)(1) (2001).  Weirich Decl. ¶ 2

12  (Ex. 2).  The defendant has been prohibited from possessing firearms or ammunition since 1989.

13  Despite this, he did in fact possess ammunition and was convicted of doing so in 2001.  And despite this

14  conviction, he was once again found in possession of firearms and ammunition when police responded

15  to the 911 domestic violence call in 2018.  Excluding probative evidence of extensive illegal firearm

16  possession in this case would carry serious social and public safety costs.  "In such a case, the criminal

17  should not go free because the constable has blundered."  *Herring*, 555 U.S. at 147–48 (internal

18  quotation marks omitted).  Here, the constable has not even blundered.  There quite plainly are no policy

19  grounds for the exclusion of evidence.

20  **III.    Search Warrants**

21      **a.    Probable Cause**

22    With or without information derived from the welfare search, the affidavits established probable

23  cause that evidence of illegal firearms possession would be found in the defendant's home.  "Probable

24  cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a

25  particular place.'"  *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates,* 462 U.S.

26  213, 238 (1983)).  The elements of possession of a firearm by a convicted felon, in violation of

27  California Penal Code section 29800, are (1) a prior felony conviction and (2) ownership or knowing

28  possession, custody, or control of a firearm.  *People v. Blakely*, 225 Cal. App. 4th 1042, 1052 (2014).

Regarding the first element, each search warrant affidavit contained the statement, "Your affiant is aware that Suspect Clarence Chan has criminal history for PC 245(a)(2), assault with a deadly weapon, a firearm, and that his conviction for this charge prohibits him from owning conventional firearms." Def.'s Exs. A, B. Consequently, the applications sought the issuance of warrants to search for and seize firearms and related property in the defendant's home. Def.'s Exs. A, B.

Regarding the second element, each search warrant affidavit contained the statement, "The victim reported that the suspect has weapons, and that she has seen the weapons." Def.'s Exs. A, B. The affidavits explained that this domestic violence victim said she had gone to the suspect's home that morning to finalize a break-up with the suspect, and, while there, before 8:50 a.m., the suspect had assaulted and battered her. Def.'s Exs. A, B. The second search warrant affidavit added further victim statements from a follow-up interview: "that the suspect buys firearms parts, assembles firearms and sells them to 'government agencies,'" and "that the suspect has shown her pictures of weapons he has sold to people." Def.'s Ex. B.

The first affidavit contained corroborating information from the welfare search, including that police "saw at least four firearms" in the suspect's home. Def.'s Ex. A. The second affidavit added further information from the ongoing search authorized by the first warrant, including the identification of additional firearms, firearms parts, ammunition, and high-capacity magazines. Def.'s Ex. B. The affidavits also contained corroborating information about the defendant's experience with firearms, including that the suspect's "DOJ Criminal History indicated that he has [a] history with firearms violations and assault with a deadly weapon, a firearm." Def.'s Exs. A, B. He also "refused to allow police to retrieve his weapons when he was presented with a Gun Violence Restraining order." Def.'s Exs. A, B.

Therefore, even without the information from the welfare search, the affidavits contained sufficient facts to establish a "fair probability" that illegal firearms would be found in the defendant's home. The defense argues that the victim was "unreliable" and that the police had a duty to independently investigate the basis of her information. Def.'s Mot. 23–24. But the police already had corroborating information showing that the victim's statements were indeed reliable: Agent Correia's prior knowledge of Chan's possession of firearms and Sgt. Philip's observation of those firearms.

Finally, just as the good-faith doctrine would apply to the officers' objectively reasonable welfare search of the defendant's home, the good-faith doctrine would apply with equal force to their reliance on a search warrant based on information from that search. *See United States v. Leon*, 468 U.S. 897, 922 (1984) ("[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion.").

### b. *Franks* Hearing

Under *Franks v. Delaware*, a defendant is entitled to a hearing to challenge the veracity of statements in a search warrant affidavit only upon a substantial preliminary showing that: (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." 438 U.S. 154, 155–56 (1978). But if, after "material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171–72.

To make this preliminary showing, the defense claims to "have identified 13 categories of material falsehoods and omissions, including lies about what the officers were told and observed." Def.'s Mot. 28. These defense claims are themselves either false or irrelevant, or both, and fail to make the required preliminary showing.

Some of the defense claims are simply false. The claim that the police did not search the defendant's home for victims in need of assistance (claim #1) is false. *See* Philip Decl. ¶¶ 9, 13–14. The claim that there was no information anyone was in need of emergency aid before police entered the home (claim #2) is false. *See* Philip Decl. ¶ 9; Def.'s Ex. F 2. The claim that the police did not call the defendant out of his home in part because of his firearms history (claim #3) is false. *See* Philip Decl. ¶¶ 6–10, 12. It also is not necessary to the finding of probable cause. The claim that the victim did not report her knowledge of the defendant's weapons (claim #4) is false. *See* Def.'s Ex. G 69:6–21. The claim that it was misleading to include the victim's statement that the defendant threatened to kill and bury her (claim #5) is false. *See* Def.'s Ex. G 23:8–25:2. It also is not necessary to the finding of probable cause. The claim that the victim did not report that the defendant attempted to strangle her

1   (claim #6) is false.  *See* Def.'s Ex. D 22:11 (describing how the defendant "choked [her] and pinned

2   [her] down), 29:16 ("And I grabbed the phone, then he choked me from here."); Def.'s Ex. G 18:8

3   ("[H]e choked me."), 21:24–27 ("I was so scared. . . .  He's laid his hands me.  He's choked me, he's

4   tackled me down, and I just kept running.").  It also is not necessary to the finding of probable cause.

5   The claim that Chan did not refuse to allow police to retrieve firearms from his residence (claim #10) is

6   false.  Def.'s Exs. A, B.  Moreover, the grounds for this claim are unclear.  The defense cites Sgt.

7   Moore's sworn affidavits, but cites nothing to refute those affidavits.  Finally, the claim that "the police

8   fabricated probable cause" to arrest the defendant (claim #11) is false and outrageous.  *See* Def.'s Exs.

9   D, E, F, G, H *passim*.

10          The claimed omissions are simply irrelevant.  The omission of the fact that the defendant placed

11   the victim's phone on top of her car after he assaulted and battered her (claim #7) is irrelevant.  The

12   omission of a description of the victim's injuries (claim #8) is irrelevant.  The omission of the fact that

13   the defendant said the police could see his text messages with the victim (claim #9) is irrelevant.

14   Indeed, the defense makes no argument why the omission of these facts from an affidavit seeking a

15   warrant to search for illegal firearms is in any way material.

16          Finally, the defense claims that the victim's statements were not credible (claim #12) and that the

17   affidavits omitted information demonstrating her lack of credibility (claim #13).  But, as noted above, by

18   the time Sgt. Moore authored the first search warrant affidavit, she already had two independent law

19   enforcement sources of information that corroborated the victim's statements:  Agent Correia's personal

20   knowledge of Chan's possession of firearms and Sgt. Philip's visual identification of those firearms.  By

21   the time she authored the second search warrant affidavit, she had additional corroboration from photos

22   of firearms sent by the defendant himself to the victim's phone, as well as from the search warrant

23   team's physical inspection of the firearms in the defendant's home.  It would have been strange for the

24   police, after independently verifying the victim's statements, to then undermine those statements.

25          "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and

26   must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate

27   falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer

28   of proof." *Franks*, 438 U.S. at 171.  "[I]f these requirements are met, and if, when material that is the

1  subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in

2  the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171–72.  The

3  defense has not made the requisite showing; consequently, no *Franks* hearing is warranted.

4  **IV.     Conclusion**

5          For the reasons above, the defendant's motion should be denied in its entirety.

6

7  DATED:  December 15, 2020                              Respectfully submitted,

8                                                         DAVID L. ANDERSON
                                                          United States Attorney
9

10                                                         */s/ Scott Simeon*

11                                                         SCOTT SIMEON
                                                          Assistant United States Attorney
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28