UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CLARENCE PETER CHAN,<br><br>Defendant. | Case No. 19-cr-00521-BLF-1<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, QUASH SEARCH WARRANTS AND TRAVERSE PURSUANT TO *FRANKS v. DELAWARE***<br><br>[Re: ECF 51] |

Before the Court is Defendant Clarence Peter Chan's Motion to Suppress Evidence, Quash Search Warrants and Traverse Pursuant to *Franks v. Delaware*. *See* Mot., ECF 51. He seeks an order suppressing evidence acquired from his residence during a warrantless search and during the execution of two search warrants ("First Warrant" and "Second Warrant"). Chan also moves to quash the two search warrants for facial insufficiency of probable cause or, alternatively, for an evidentiary hearing on the search warrant affidavits pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). The motion is opposed by the Government.

For the reasons discussed below, Chan's motion to suppress is GRANTED as to evidence acquired during the warrantless search and during execution of the First Warrant, but DENIED as to evidence acquired during execution of the Second Warrant. The motion to quash the warrants for facial insufficiency or, alternatively, for a *Franks* hearing is DENIED.

## I. BACKGROUND

*911 Call*

At approximately 8:50 a.m. on May 28, 2018, the Palo Alto Police Department received a 911 call from a female ("the victim") stating that the man she had been dating tackled her, took her cellular telephone, and threatened her. *See* 911 Call Tr. 1:9-28, Forsyth Decl. Exh. D, ECF 51-3. The victim stated that she had run to a neighbor's home. *See id.* 1:26-3:3. The neighbor then spoke with the 911 dispatcher through a Mandarin translator, stating that the victim was scared and unstable. *See id.* 6:8-12. The victim got back on the phone and said that her attacker was Clarence Chan, described Chan as a 48-year old Chinese man weighing approximately 180 pounds, and gave Chan's address as 3195 Alexis Drive. *See id.* 7:11-8:26. The victim said that there was nobody else home with Chan. *See id.* 11:7-8, 12:3-4. She explained that Chan had asked for her phone to see if she was texting with other men, tackled her, took her phone and threw it across the street, chased her when she ran, and choked her. *See id.* 13:3-26.

*Police Response*

Officers were dispatched in response to the call. The dispatcher initially informed officers that the victim had run to a neighbor's home at 3195 Alexis Drive, which actually was the address of Chan's home. *See* Police Dispatch Audio Recording 1:11-28, Forsyth Decl. Exh. E, ECF 51-3. The dispatcher also reported that the victim was hysterical, and had been tackled by her boyfriend, Clarence Chan. *See id.* 1:24-2:20. The dispatcher then announced that Chan lived at 3195 Alexis Drive. *See id.* 2:21-22.

In addition to providing information via radio, police dispatch also provided information through written messages on the computer-aided dispatch ("CAD") system. *See* Philip Decl. ¶ 9, ECF 54-1; CAD Printout, Forsythe Exh. F, ECF 51-3. At approximately 9:01 a.m., dispatch wrote on CAD that "HE ALSO HAS HER FRIEND." CAD Printout p. 2. At approximately 9:14 a.m., the CAD entry was corrected to, "HE HAS HER PHONE NOT 'FRIEND.'" CAD Printout p. 3.

When the radio dispatcher identified Chan as the suspect, Palo Alto Police Agent Chris Correia announced over the police radio that Chan was his friend, was police-friendly, and had "numerous weapons, swords and guns." Police Dispatch Audio Recording 2:25-3:4, Forsyth Decl.

2

Exh. E, ECF 51-3; Philip Decl. ¶ 6, ECF 54-1. The on-duty patrol supervisor, Brian Philip, heard Correia's comments and requested that Correia call him. *See* Philip Decl. ¶ 6. Correia did so, and informed Philip that Chan was a weapons enthusiast who owned swords and guns. *See id.* Philip then began driving to the scene. *See id.* ¶ 9.

While driving, Philip heard over the police radio that Chan's premises history included a 2014 call regarding a false electrical box where guns may be kept. *See* Philip Decl. ¶ 8, ECF 54-1. Philip also was advised via police radio that Chan's criminal history included assault with a deadly weapon and firearms charges. *See id.* ¶ 10. Philip decided to stage police officers and medics at a location away from Chan's residence. *See id.* ¶ 7. Philip arrived at the staging area down the hill from Chan's residence and took charge of the tactical response team. *See id.* ¶ 11. Sergeant Adrienne Moore took charge of the criminal investigation team and later took responsibility for obtaining search warrants. *See id.*

*Chan's Arrest and Warrantless Search of Residence*

Philip and his tactical team moved toward Chan's residence. *See* Philip Decl. ¶ 12, ECF 54-1. The officers used their cars as a barricade, deployed rifles for their own protection, and called Chan out of the house. *See id.* Chan came out of his house and was taken into custody. *See id.* Philip and three other officers then entered Chan's home. *See id.* ¶ 13. According to Philip, the purpose of the entry was to check for an additional victim. *See id.* ¶ 14. The officers cleared the house and outbuildings without finding anyone. *See id.* ¶ 16. The officers observed numerous firearms, firearm parts, boxes of ammunition, body armor, and other weapon-related material in Chan's home. *See id.* Philip reported viewing the weapons and ammunition to Moore. *See id.* ¶ 17.

Meanwhile, other officers interviewed the victim. *See* Clausen Audio Recording, Forsythe Exh. G, ECF 51-3. The victim stated that Chan told her he builds guns for a living, that police buy guns from him, and that Chan has bulletproof vests. *See id.* 69:5-21. The police obtained a Gun Violence Restraining Order that day, May 28, 2018. *See* First Warrant and Affidavit, Forsythe Decl. Exh. A, ECF 51-3. Chan was arrested for domestic violence, terrorist threats, and false imprisonment. *See id.*

3

*First Search Warrant*

Later in the day on May 28, 2018, the police obtained the First Warrant, authorizing a search of Chan's residence and vehicles for firearms and ammunition. *See* First Warrant and Affidavit, Forsythe Decl. Exh. A, ECF 51-3. The affidavit for the First Warrant was sworn by Sergeant Moore, who described the domestic violence call, the weapons observed during the warrantless search of the home (referred to as a "protective sweep"), Chan's status as a felon, and the results of a computer check showing that Chan did not have any weapons legally registered to him. *See id.* The affidavit also stated that Chan had been arrested that day for domestic violence, terrorist threats, and false imprisonment. *See id.* The First Warrant was executed the following morning, on May 29, 2018. *See* Second Warrant and Affidavit, Forsythe Decl. Exh. B, ECF 51-3. That search revealed numerous firearms, ammunition, and body armor. *See id.*

*Second Search Warrant*

On May 29, 2018, while the search pursuant to the First Warrant was ongoing, Moore obtained the Second Warrant. *See* Second Warrant and Affidavit, Forsythe Decl. Exh. B, ECF 51-3. Moore amended her earlier affidavit to add new information regarding the firearms and other items found at Chan's home during execution of the First Warrant, and new information acquired from a May 29, 2018 interview of the victim conducted by Office Yolanda Claussen. *See id.* The amended affidavit included the victim's statements that Chan buys firearms parts, assembles firearms, and sells them to government agencies. *See id.* The victim also said Chan had shown her pictures of firearms he sold, and had told her that there is a safe concealed under the back deck of his home. *See id.* The Second Warrant expanded the scope of the search to include outbuildings, inoperable vehicles, garbage cans, and containers on the property. *See id.* The Second Warrant also expanded the list of items to be seized to include firearms accessories; documents showing dominion and control over the property, including bills; receipts and credit card statements showing purchase of guns or gun accessories; and images showing Chan with firearms, ammunition, or firearm accessories. *See id.* Execution of the two warrants on May 29, 2018 resulted in seizure of numerous firearms and related contraband.

4

*Indictment*

On October 10, 2019, a federal grand jury returned a four-count Indictment charging Chan with: (1) felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1); (2) possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d); (3) possession of a firearm with obliterated serial number in violation of 18 U.S.C. § 922(k); and (4) possession of body armor by a violent felon in violation of 8 U.S.C. § 922(k). *See* Indictment, ECF 17.

## II. DISCUSSION

Chan moves to suppress all evidence acquired during to the warrantless search of his residence and during execution of the two warrants. He argues that the warrantless search was unlawful, and that all evidence acquired during execution of the two warrants must be suppressed because the warrants were tainted by information acquired during the unlawful warrantless search. Chan also argues that the warrants must be quashed because the supporting affidavits do not establish probable cause or, alternatively, that he is entitled to a *Franks* hearing with respect to the warrant affidavits.

In opposition, the Government argues that the warrantless search of Chan's property was lawful under the emergency aid and good faith exceptions to the warrant requirement. Even if the warrantless search was unlawful, the Government argues, the evidence acquired pursuant to the two search warrants is admissible under the independent source and inevitable discovery doctrines. Finally, the Government argues that the affidavits supporting the warrants establish probable cause and that Chan has not established a basis for a *Franks* hearing.

Based on the parties' assertion that the motion could be resolved solely on the record, the Court set the motion for oral argument on March 2, 2021. At the conclusion of that hearing, the Court ruled from the bench that the warrantless search was unlawful, and that the First Warrant was unlawful because it was tainted by information acquired from the warrantless search. In response to the Court's expression of concern that the Second Warrant likewise was tainted, the Government argued that an evidentiary hearing was required to determine whether evidence acquired during execution of the Second Warrant was admissible under the inevitable discovery doctrine. The Court set an evidentiary hearing for March 23, 2021. Given its rulings, the Court

5

determined that there was no need for a *Franks* hearing, and that in any event Chan had not made an adequate showing of fraud in the warrant affidavits to obtain a *Franks* hearing.

Below, the Court summarizes the oral rulings it made at the conclusion of the March 2, 2021 hearing and provides its reasons for those rulings. The Court then addresses the evidence and arguments presented at the March 23, 2021 evidentiary hearing.

### A.      March 2, 2021 Hearing

#### 1.      Warrantless Search of Chan's Residence

Chan argues that the warrantless search of his residence violated his rights under the Fourth Amendment. The Government contends that the search falls within the emergency aid and good faith exceptions to the Fourth Amendment's warrant requirement. After hearing oral argument on March 2, 2021, the Court ruled from the bench that the warrantless search violated Chan's federal constitutional rights and did not fall within an exception to the Fourth Amendment's warrant requirement. For the reasons stated on the record and discussed below, the motion to suppress is GRANTED as to evidence acquired from the warrantless search of Chan's residence.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quotation marks and citations omitted). However, "the warrant requirement is subject to certain exceptions." *Id.* For example, "[t]he emergency aid exception permits law enforcement officers to 'enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 876 (9th Cir. 2018) (quoting *Brigham City*, 547 U.S. at 403). In addition, the Supreme Court has held that "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal quotation marks and citations omitted).

#### a.      Emergency Aid Exception

"An entry pursuant to the emergency aid exception is 'reasonable' under the Fourth

6

Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify [the] action." *Bonivert*, 883 F.3d at 876 (quotation marks and citation omitted). "[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests, because the emergency exception is narrow and rigorously guarded." *Id.* (quotation marks and citations omitted). The Ninth Circuit has articulated a two-part test to determine whether the police have met their heavy burden in a particular case. *See United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008). That test "asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *Id*.

The Government has not satisfied the first prong of the test in this case. At the time Philip made the decision to enter Chan's residence, Chan had been taken into custody and the victim was safe at a neighbor's home. The Government argues that Philip reasonably believed that a second victim might be inside Chan's residence, pointing to Philip's declaration statements that "[a]t some point I learned that the suspect had the female's friend inside his residence," and that the reason he entered Chan's home was to search for a second victim. Philip Decl. ¶¶ 9, 14, ECF 54-1. Even accepting at face value Philip's statements that he believed a second victim might be in Chan's house, "law enforcement's subjective motivations are irrelevant in determining whether the emergency doctrine applies." *Snipe*, 515 F.3d at 952. The relevant question is whether Philip and the other officers had an objectively reasonable basis to believe there might be a second victim.

Philip does not say how he "learned" that Chan had the victim's friend. *See* Philip Decl. ¶ 9. The victim told the dispatcher during the 911 call that there was nobody else in Chan's home. *See* 911 Call Tr. 11:7-8, 12:3-4, Forsyth Decl. Exh. D, ECF 51-3. There is no evidence that she said anything different when officers arrived on scene. When Chan was taken into custody, he stated multiple times that no one else was inside his home. *See* Clausen Audio Recording 3:13-5:3, Forsythe Decl. Exh. G, ECF 51-3. The Government suggests that Philip relied on erroneous information obtained from the CAD. The CAD printout from the incident shows that at

7

1  approximately 9:01 a.m., dispatch wrote on CAD that "HE ALSO HAS HER FRIEND." CAD
2  Printout p. 2, Forsythe Exh. F, ECF 51-3. The Court notes that Philip does not state in his
3  declaration that he ever saw or relied on the erroneous CAD entry. In any event, the CAD entry
4  was corrected within minutes to read "HE HAS HER PHONE NOT 'FRIEND.'" CAD Printout p.
5  3. The correction to CAD was made at 9:14 a.m. and the warrantless entry occurred at 9:28 a.m.
6  Thus at the time of entry, there was no objective basis to believe that a possible second victim was
7  in the home.

8        The Government argues that deference must be given to the officers due to confusion at the
9  scene, asserting that "[b]ecause of the generally volatile nature of domestic violence incidents, the
10 emotional state of the victim, the relaying of information through the neighbor, and the translation
11 of this information through an interpreter, dispatch repeatedly described the situation as
12 'convoluted.'" Opp. at 10, ECF 54. To the extent the Government suggests that heightened
13 deference is warranted in domestic violence cases, the Ninth Circuit has expressly rejected such an
14 approach, holding that "all of our decisions involving a police response to reports of domestic
15 violence have required an objectively reasonable basis for believing that an *actual or imminent*
16 *injury* was unfolding in the place to be entered." *Bonivert*, 883 F.3d at 877. To the extent the
17 Government argues that the "convoluted" nature of the scene justified entry into Chan's home, the
18 Ninth Circuit has held that where it is unclear whether there are reasonable grounds to believe an
19 emergency exists, the police must take additional steps to determine whether there is an
20 emergency justifying warrantless entry. *See United States v. Garcia*, 749 F. App'x 516, 519 (9th
21 Cir. 2018). Had Philip and his team checked the CAD or checked with the victim, they would
22 have realized there was no basis to believe another victim might be in Chan's residence.

23       The cases on which the Government relies are factually distinguishable. In *Black*, the
24 domestic violence victim called the police to report that the defendant had beaten her up that
25 morning in his apartment, that he had a gun, and that she was going to the apartment to retrieve
26 her belongings. *See United States v. Black*, 482 F.3d 1035, 1039 (9th Cir. 2007). When the police
27 arrived at the apartment building, they encountered the defendant but not the victim, and they
28 entered the apartment unit using a key found in the defendant's pocket. *See id.* In *Snipe*, the

police did not know where the reporting party was, there was a strange car in the driveway of the residence, and the door of the residence was open. *See Snipe*, 515 F.3d at 949. In *Russell*, two 911 calls reported shooting inside a residence, the circumstances were unclear, and it was unclear whether the shooter and/or other people were inside the residence. *See United States v. Russell*, 436 F.3d 1086, 1088 (9th Cir. 2006). In all of those cases, the location of the reporting party was unknown at the time of entry and the circumstances gave rise to a reasonable belief that the reporting party might be inside the residence and in need of aid. In the present case, both the victim and Chan were secured and the circumstances did not give rise to a reasonable belief that another victim was in Chan's home.

The Court finds that the Government has failed to meet its heavy burden to show that the warrantless entry falls within the emergency aid exception.

### b.      Good Faith Exception

The Government asserts that, "[e]ven if the welfare search was not lawful, the police had a good-faith basis to believe that it was; therefore, the information obtained from that search is properly admissible." Opp. at 11, ECF 54. The Supreme Court has applied the good faith exception "across a range of cases." *Davis*, 564 U.S. at 232 (exception applied when police conducted a search in compliance with then-binding precedent that later was overruled); *see also Herring v. United States*, 555 U.S. 135, 136-37 (2009) (exception applied when police officer reasonably but mistakenly believed that there was an outstanding arrest warrant due to another's bookkeeping error); *Illinois v. Krull*, 480 U.S. 340, 342 (1987) (exception applied when officers relied on a statute that subsequently was invalidated); *United States v. Leon*, 468 U.S. 897, 900 (1984) (exception applied when officers relied on facially valid search warrant later found to be unsupported by probable cause). The common thread is that the officers' good faith belief in the validity of their actions was objectively reasonable.

As discussed above, the officers' belief that another victim might be in Chan's home was not objectively reasonable under the circumstances. Moreover, the Supreme Court cases applying the good faith exception involved officers' reliance on facially valid authority for the search, such as then-binding precedent, *see Davis*, 564 U.S. at 232, a statute that subsequently was invalidated,

*see Krull*, 480 U.S. 342, or a facially valid search warrant, *see Leon*, 468 U.S. at 900. The officers in the present case did not rely on any such authority in deciding to conduct a warrantless search of Chan's premises.

The Court finds that the Government has failed to meet its burden to show that the warrantless entry falls within the good faith exception.

### 2. Search Warrants

Chan argues that all evidence acquired during execution of the search warrants must be suppressed because the warrants were tainted by the unlawful warrantless search. The Government asserts that even if the warrantless search was unlawful, the evidence acquired pursuant to the two search warrants is admissible under the independent source and inevitable discovery doctrines. At the conclusion of the hearing on March 2, 2021, the Court ruled from the bench that the First Warrant was unlawful as tainted by the warrantless search. The Court also indicated that the Second Warrant appeared to be tainted, but it granted the Government's request for an evidentiary hearing as to whether evidence acquired pursuant to the Second Warrant is admissible under the inevitable discovery doctrine. Accordingly, for the reasons stated on the record and discussed below, the motion to suppress is GRANTED as to evidence acquired from execution of the First Warrant. Application of the inevitable discovery doctrine with respect to the evidence acquired pursuant to the Second Warrant is touched on briefly as follows and discussed in more detail in section II.B, below.

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988) (citations omitted). "Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id*. at 536-37 (quotation marks and citation omitted). Evidence that otherwise would be subject to the exclusionary rule may be admissible under two separate but related doctrines, the independent source doctrine and the inevitable

10

discovery doctrine. *See id.* at 537, 539.

### a. Independent Source Doctrine

Under the independent source doctrine, "evidence initially discovered during, or as a consequence of, an unlawful search, but later acquired independently from activities untainted by the initial illegality" is admissible. *Murray*, 487 U.S. at 537. Thus, where evidence is acquired as a result of an illegal entry, but the same evidence later is acquired pursuant to a lawful warrant, the evidence is admissible under the independent source doctrine. *See id.* at 541. The Supreme Court has held that "[s]o long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply." *Id*. at 542. The "ultimate question" the Court must answer in determining the applicability of the independent source doctrine to evidence acquired pursuant to a search warrant "is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue." *Id*. "This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information acquired during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id*.

In the present case, the Government argues that the search warrant affidavits were based not only on the information acquired during the initial warrantless entry, but also on at least one other independent source, the victim. The Government argues that even if the information regarding weapons viewed in Chan's home were excised from the warrant affidavits, the warrants nonetheless would have issued based solely on information provided by the victim. Under the standard set forth above, however, the independent source doctrine does not apply if information acquired during the initial unlawful entry was presented to the Magistrate Judge and affected the Magistrate Judge's decision to issue the warrants. Information acquired during the initial unlawful entry was included in the warrant affidavits, including references to rifles, body armor, and Pelican Cases seen in Chan's residence during the warrantless entry. *See* First Warrant and Affidavit, Forsythe Decl. Exh. A, ECF 51-3; Second Warrant and Affidavit, Forsythe Decl. Exh. B, ECF 51-3. The Government has not demonstrated that those statements did not affect the Magistrate Judge's decision to issue the warrants.

Accordingly, the Court finds that the Government has failed to demonstrate that evidence acquired pursuant to the warrants may be admitted under the independent source doctrine. In fact, it appears that both warrants were tainted by information acquired during the unlawful warrantless search of Chan's residence.

### b.     Inevitable Discovery Doctrine

Under the inevitable discovery doctrine, tainted evidence is admissible if it inevitably would have been discovered through lawful means. *See Murray*, 487 U.S. at 539. The Supreme Court has held that "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix v. Williams*, 467 U.S. 431, 446 (1984). In order to demonstrate the admissibility of evidence under this doctrine, the prosecution must establish by a preponderance of the evidence that the evidence inevitably would have been discovered by lawful means. *See id.* at 444. "The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray*, 487 U.S. at 539.

When the Court expressed its concern at the March 2, 2021 hearing that both warrants were tainted by the initial unlawful entry, the Government argued that the evidence acquired pursuant to the Second Warrant is admissible under the inevitable discovery doctrine. Specifically, the Government argued that once the victim was interviewed on May 29, 2018, the Government would have sought and obtained a search warrant of Chan's residence based on information provided by the victim and other information unrelated to the warrantless search. The Government requested an evidentiary hearing on the application of the inevitable discovery doctrine to evidence acquired pursuant to the Second Warrant. The Court set an evidentiary hearing for March 23, 2021 on that limited issue.

The motion to suppress is GRANTED as to evidence acquired during execution of the First Warrant. The motion to suppress evidence acquired during execution of the Second Warrant is discussed in section II.B., below.

### 3. Motion to Quash or, Alternatively, for *Franks* Hearing

Having concluded that both warrants are tainted by information acquired during the warrantless entry of Chan's residence, the Court need not reach Chan's assertions that the warrants should be quashed based on a facial insufficiency of probable cause or, alternatively, that he should be granted a *Franks* hearing. As the Court noted at the hearing, however, the warrants appeared to be facially valid and Chan has not presented evidence of fraud sufficient to warrant a *Franks* hearing.

The motion to quash the warrants or, alternatively, for a *Franks* hearing DENIED AS MOOT.

### B. March 23, 2021 Evidentiary Hearing

On March 23, 2021, the Court held the evidentiary hearing requested by the Government. The Court clarified at the start of the hearing that the only issue still open was the applicability of the inevitable discovery doctrine as a basis for denying Chan's motion to suppress evidence acquired pursuant to the Second Warrant.

As discussed above, the inevitable discovery doctrine permits the admission of evidence otherwise subject to the exclusionary rule "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444. "The government can meet its burden by demonstrating that, by following routine procedures, the police would inevitably have uncovered the evidence." *United States v. Lopez-Soto*, 205 F.3d 1101, 1107 (9th Cir. 2000) (quotation marks and citation omitted).

The Government called three witnesses to present evidence on this issue: Palo Alto Police Agent Chris Correia, Palo Alto Police Officer Yolanda Clausen, and Palo Alto Police Sergeant Adrienne Moore. Chan did not call any witnesses, but his counsel cross-examined the three Government witnesses. The Court accepted into evidence, without objection, all of the documents proffered by both sides, including Chan's Exhibits A-G submitted with his motion to suppress and docketed at ECF 51-3, and the Government's Exhibits 5-8 and 11, docketed at ECF 68.

The witness testimony, which lasted more than three hours, cannot be summarized in full here. The Court highlights key aspects of the testimony and documentary evidence as follows.

### 1. Agent Chris Correia

Agent Correia testified on direct examination to the following: he has been with the Palo Alto Police Department for almost thirteen years. He was on duty as a field training officer when he became aware of the 911 call requesting police service at Chan's home. He did not respond to the call, because he and a trainee were transporting a subject to jail. However, Correia had encountered Chan on several occasions and had discussed weapons with him. Correia formed the impression that Chan collected firearms and other weapons. Correia broadcast on the police radio that Chan owns swords and guns, and that he is pro-police. Shortly thereafter, Correia spoke with Sergeant Brian Philip, the on-duty patrol supervisor who ultimately led the warrantless entry into Chan's home. Correia told Philip that he (Correia) believed that Chan owned weapons.

On cross-examination, defense counsel elicited Correia's testimony that he had never seen Chan with a firearm, and that Correia had formed the assumption that Chan owned firearms based on Chan's extensive knowledge of firearms and the context of their conversations.

### 2. Officer Yolanda Clausen

Officer Clausen testified on direct examination to the following: she has been with the Palo Alto Police Department for five years. She has extensive training in the area of domestic violence, and she served on the task force that created the Domestic Violence Protocol for Law Enforcement adopted by Santa Clara County in March 2018 ("the Protocol"). The Protocol was introduced into evidence. Officer Clausen testified that the Palo Alto Police Department draws its domestic violence protocol from the County's Protocol. Of particular relevance to this case, Clausen examined the Protocol on the witness stand, and testified that when law enforcement officers respond to domestic violence calls, they are required to determine if any weapon is involved or in the home. Pursuant to the protocol, if a valid restraining order is obtained that prohibits firearms possession or ownership by a person involved in the domestic violence incident, the officer "shall" make a record of efforts to determine if the restrained person possesses any firearms or ammunition, including requesting a search warrant.

Officer Clausen was one of the officers who responded to the 911 call on May 28, 2018.

1   She understood the situation to involve an altercation between a male and a female, and that the
2   male had guns and swords. Clausen also received information about the male's – Chan's –
3   criminal history, including history of assault with a firearm, a felony. Clausen interviewed the
4   victim at the scene, and observed that the victim was a petite woman weighing approximately 100
5   pounds, that she had visible red marks on her neck, and that she appeared to be scared. The victim
6   told Clausen that Chan makes guns for the government, and that she often saw gun parts being
7   shipped to his house, and vest materials and chest plates. Clausen relayed the victim's statements
8   to her supervisor, Sergeant Adrienne Moore, who also was at the scene. The victim was provided
9   with an Emergency Protective Restraining Order at the scene.

10   Officer Clausen interviewed the victim again the day after the incident, on May 29, 2018,
11   that time at the police station. Clausen stated that it is standard procedure to interview domestic
12   violence victims in the days after the event. Clausen asked the victim to identify any text
13   messages she had received from Chan that made her feel threatened. The victim showed Clausen
14   text messages from Chan showing photographs of firearms. Those texts and photographs were
15   introduced into evidence, as was the transcript of Clausen's interview with the victim. The victim
16   stated that Chan had many firearms in his home, lying around everywhere. Chan told her that
17   those were fake guns. However, she said Chan built real firearms for police officers, and that he
18   had bulletproof vests in his home. The photographs of firearms that Chan texted to the victim
19   appeared real to Clausen, based on her training in firearms as a law enforcement officer.

20   During the victim interview, Clausen took occasional breaks to relay the information
21   obtained from the victim to Sergeant Moore, who was in the process of preparing the affidavit for
22   the Second Warrant.

23   On cross-examination, defense counsel attempted to elicit testimony from Clausen that
24   would cast doubt on the victim's statements. For example, he questioned how the officers knew
25   that the telephone number from which the texts and gun photographs were sent to the victim
26   belonged to Chan. Officer Clausen stated that the telephone number was given to Officer Miller
27   by Chan and recorded in the police report as Chan's telephone number. Defense counsel also
28   elicited testimony from Clausen that the victim did not appear knowledgeable about firearms, and

1   might not be able to tell a real gun from a fake gun.  Defense counsel also questioned whether
2   Officer Clausen could state with certainty that the photographs sent to the victim actually were
3   taken by Chan.  Clausen testified that one photograph showed a Glock firearm with keys for a
4   Mustang and a Ferrari, and that Chan owns a Mustang and a Ferrari.

### 3. Sergeant Adrienne Moore

Sergeant Moore testified on direct examination to the following facts.  She has been a police officer for thirty-five years.  She responded to the 911 call on May 28, 2018.  Moore stated that the incident between the victim and Chan went beyond shouting to pushing and shoving, and that dispatch had reported that Chan put his hands on the victim's neck.  Moore also was informed by dispatch that Chan had a criminal history that included assault with a deadly weapon.  Moore spoke with the victim at the scene, and learned that the victim stated that Chan had firearms.  Moore was aware that an Emergency Protective Order was obtained and served on Chan at the scene.  Moore then obtained a Gun Violence Restraining Order, which was introduced into evidence.  Sergeant Moore testified that it is illegal for a felon to possess a firearm or body armor.  Moore obtained the First Warrant for Chan's residence on May 28, 2018.

Moore obtained the Second Warrant the following day, May 29, 2018.  She was in contact with Clausen while preparing the affidavit.  At some point, Clausen or someone else told Moore that Chan's place of work was Bare Speed.  Moore searched the Bare Speed name on the internet, and it appeared to be a website where weapons were manufactured and sold to law enforcement.  It was Moore's understanding that Bare Speed was Chan's website.  Moore included in the affidavit for the Second Warrant information that Chan was manufacturing and selling firearms.  Based on the information Moore was receiving regarding Chan's manufacturing of firearms, and possession of firearms, she believed that she had an obligation under the Protocol to investigate and seize any firearms in Chan's possession.  She testified that she would have sought a search warrant of Chan's residence based on the information received from the victim and Chan's criminal history, even without the information acquired during the warrantless search and search pursuant to the First Warrant.

On cross examination, Sergeant Moore stated that she had not seen the photographs of

16

weapons that Chan had texted to the victim, but had relied on Clausen's reporting to include that information in the affidavit for the Second Warrant. Defense counsel tried to get Moore to concede that the victim was unable to tell real guns from fake guns. Moore stated that the victim's ability to do so was not her concern. Her concern was that the victim reported that she had seen guns in Chan's home. Defense counsel also elicited Moore's testimony that the victim declined medical attention at the scene. He also got Moore to admit that she could not definitively link the Bare Speed website to Chan.

After considering the witness testimony and the documentary evidence, the Court finds that the Government has shown by a preponderance of the evidence that even without the evidence acquired during the unlawful searches of Chan's property, the police would have sought and obtained a search warrant during the ordinary course of their investigation into the domestic violence incident. Officer Clausen and Sergeant Moore both testified that under the Protocol, they were *required* to investigate whether Chan possessed any weapons. The information provided by the victim, including her statements that Chan had guns and bulletproof vests in his home, and the photographs of firearms that Chan texted to the victim, would have been sufficient to establish probable cause for the search. Additional evidence regarding the Bare Speed website, Correia's statements regarding Chan's collection of weapons, and Chan's criminal history also would have supported probable cause.

The Court finds the testimony of all the witnesses to be credible. While defense counsel was zealous in attempting to find weaknesses in the witnesses' testimony, none of his efforts undermined their testimony. Accordingly, the Court finds that all of the evidence acquired from Chan's residence pursuant to the Second Warrant inevitably would have been discovered by law enforcement in the ordinary course of their investigation of the domestic violence incident based on lawful sources.

The motion to suppress the evidence acquired during execution of the Second Warrant is DENIED.

//

//

**III. ORDER**

(1) The motion to suppress evidence is GRANTED as to evidence acquired during the warrantless search and during execution of the First Warrant, and DENIED as to evidence acquired during execution of the Second Warrant; and

(2) The motion to quash the warrants or, alternatively, for a *Franks* hearing is DENIED AS MOOT.

Dated: April 19, 2021

_____
BETH LABSON FREEMAN
United States District Judge